**EOD**

03/31/2022

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| IN RE: | § |
| | § |
| JMV HOLDINGS LLC | § CASE NO. 18-42552 |
| | § (Chapter 7) |
| DEBTOR | § |
| _____ | § |
| | § |
| JENNIFER C. RUFF, | § |
| Plaintiff, | § |
| | § |
| v. | § ADVERSARY NO. 21-4003 |
| | § |
| SUZANN RUFF AND CHRISTOPHER | § |
| J. MOSER, CHAPTER 7 TRUSTEE | § |
| Defendants. | § |

## FINDINGS OF FACT AND
## CONCLUSIONS OF LAW

The plaintiff, Jennifer C. Ruff, filed a complaint initiating this adversary proceeding on
January 11, 2021.  The adversary proceeding, at its core, involves competing claims from Suzann
Ruff and Jennifer Ruff to the assets of JMV Holdings LLC (the "***Debtor***" or "***JMV***") (*i.e.*,
$426,000.00 of proceeds from the sale of the Debtor's only asset, a house, in the underlying
bankruptcy case).[1]  The chapter 7 trustee also objects to Jennifer's secured claim as a preference,
among other objections.  The Court conducted a trial on December 28 and 29, 2021, and the parties
presented evidence and legal arguments to the Court.  The parties subsequently filed a stipulation
of facts on January 24, 2022.

The Court, having considered the evidence and the parties' legal arguments, as well as the
parties' stipulation of facts, makes the following findings of fact and conclusions of law by a

---

[1] For the sake of clarity, the Court will refer to Jennifer, Suzann, Arthur and Michael Ruff by their first
names throughout these findings and conclusions.

1

preponderance of the evidence pursuant to Federal Rule of Civil Procedure 52, as applied to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052.  Where appropriate, any finding of fact herein that should more appropriately be regarded as a conclusion of law shall be deemed as such, and vice versa.

## JURISDICTION

This Court has jurisdiction of the claims and controversies asserted in this adversary proceeding under 28 U.S.C. § 157(b).  The predicates for the relief sought herein are 11 U.S.C. §§ 101 *et seq*. (the "**Bankruptcy Code**"), and, more specifically, 11 U.S.C. § 506(a); 28 U.S.C. §§ 2201-2202; as well as Rules 3007, 3012, and 7001(2) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## FINDINGS OF FACT

1.      Suzann is the widow of Arthur Ruff, who died in 1998.  Arthur had been an extremely successful businessman.  Suzann and Arthur amassed a considerable amount of wealth during their marriage.

2.      Suzann and Arthur Ruff had five children: Michael, Matthew, Tracy, Kelly and Mark.

3.      Suzann is financially unsophisticated.  Following Arthur's death, Suzann turned to one of her sons, Michael Arthur Ruff, to help manage her financial affairs.  Michael was 22 years old at that time and a recent graduate of Rice University.

4.      Michael married Jennifer, who had also attended Rice University, several years later in February 2003.  Jennifer stopped working after becoming pregnant and has been a full-time mother since 2004.

**Suzann's Trust**

5.      On July 26, 2007, Suzann, as Settlor, and Michael, as the initial trustee, executed an agreement which established the Ruff Management Trust (the "***Trust***").  Shortly thereafter, Suzann transferred substantially all her assets to the Trust.  Suzann was the primary beneficiary of the Trust.

6.      By 2009, Suzann had begun to suspect that Michael was abusing his fiduciary position to divest her assets and divert the proceeds for his own use and benefit.  On November 20, 2009, due to the family dispute, Michael resigned as trustee of the Trust.

7.      In addition, on October 2, 2009, Suzann and Michael signed a Family Settlement Agreement and Release ("***FSA***").

8.      Frost Bank was appointed to serve as the successor trustee of the Trust.  On February 26, 2010, Suzann executed a Release and Indemnity Agreement that purported to release Frost as well as all the Ruff children, except Michael, from any claims arising out of the prior administration of the Trust.  The 2010 Release and Indemnity Agreement contained an arbitration clause.

9.      In 2011, Suzann initiated litigation in the Probate Court of Dallas County, Texas (the "***Probate Court***"); Cause No. PR-11-02825-1 (the "***Fiduciary Lawsuit***") to pursue claims of breach of fiduciary duty and fraud against Michael in relation to his prior administration of the Trust and her real property in Palo Pinto County, Texas.

10.     Thereafter, relying upon the arbitration provision in the 2010 Release and Indemnity Agreement, among other things, Michael sought to resolve the dispute with his mother through arbitration, filing a Demand for Arbitration against Suzann with the American Arbitration Association ("***AAA***"), Case No. 71-20-1200-0640 (the "***Arbitration***"), and a motion to compel

arbitration in the Fiduciary Lawsuit.  The Probate Court granted the motion and ordered the parties

to arbitrate their dispute.  Suzann then filed a counterclaim in the Arbitration to assert the same

breach of fiduciary duty and fraud claims against Michael as she had asserted in the Fiduciary

Lawsuit.  Michael asserted affirmative defenses, including that the FSA's release barred her claims

against him, and he asserted a counterclaim seeking, among other things, a judgment that the FSA

was valid and barred Suzann's claims against him.

11.     On December 7, 2017, the AAA issued its Final Award in Arbitration (the

"***Arbitration Award***") pursuant to which the panel awarded Suzan $49 million in actual damages,

greater than $3.9 million in attorney's fees and approximately $12.8 million in prejudgment

interest against Michael.  Additionally, as relevant to this proceeding, the panel determined:

> A constructive trust exists and is imposed in favor of Suzann Ruff on Michael Ruff's interests, of whatever nature, in any entity which he formed or invested, in whole or in part with monies or property misappropriated from, and originating with Suzann Ruff in all capacities, *which the Panel finds includes*, but is not limited to, any interest of whatever nature Michael has in *the entities listed on Exhibit "A" to the final Award attached hereto* and made a part hereof for all purposes."  Michael Ruff shall hold his ownership interests in such interests as constructive trustee for the benefit of Suzann Ruff, and Suzann Ruff shall be entitled to a lien against such ownership interests to enforce this Award.

(Emphasis added.).

12.     The Arbitration Award expressly denied Michael's affirmative defenses of release

or waiver because Michael had fraudulently induced Suzann into signing "the alleged 2010

Release and Indemnity Agreement (the "2010 RIA"), and any other alleged settlement

agreements."  The Arbitration Award made specific findings regarding Michael's conduct toward

his mother, including the following:

a.     Michael had a special and confidential relationship with Suzann;
b.     Michael breached that relationship;
c.     Michael committed fraud as to Suzann;
d.     Michael misapplied fiduciary property belonging to Suzann;

e.   Michael converted Suzann's assets;

f.   Michael was unjustly enriched by his conduct;

g.   Michael failed to properly account to Suzann in connection with his fiduciary duties; and

h.   Michael committed negligence that caused harm and damage to Suzann.

13.   The Arbitration Award also specifically found that Michael failed to provide a proper accounting to Suzann in connection with his fiduciary duties as Trustee of the Ruff Management Trust and as agent under a power of attorney from Suzann.

14.   Armed with the Arbitration Award, Suzann returned to the Fiduciary Lawsuit pending in Probate Court #1 of Dallas County, Texas.  Cause No. PR-11-02825-1 ("**State Court Proceeding**").  Suzann requested the Dallas County Probate Court's entry of a final judgment consistent with the Arbitration Award.  On April 10, 2018, the Dallas County Probate Court entered a Modified and Corrected Final Judgment ("**Judgment**") incorporating the terms of the Arbitration Award.

15.   Neither Plaintiff Jennifer Ruff nor the Debtor JMV Holdings LLC was named as a party in the Arbitration Proceeding or the State Court Proceeding.  They did not participate in the Arbitration Proceeding or the State Court Proceeding, and they were not named as a party against whom relief was being granted in the Arbitration Award or the Judgment.  However, JMV Holdings LLC and JMV Managers LLC were included on the entities and properties listing attached as Exhibit "A" to the Arbitration Award.

16.   Michael filed an appeal of the Judgment to the Fifth Court of Appeals for the State of Texas, which affirmed the Judgment.  Michael filed an appeal to the Texas Supreme Court.  The Texas Supreme Court in Cause No. 20-0833, styled *Michael A. Ruff, et al. v. Suzann Ruff, Individually and in her Capacity as Trustee of the Ruff Management Trust, et al.* (the "**State Court**

*Appeal*"), denied Michael Ruff's Petition for Review of the Judgment and subsequently denied a Michael Ruff's motion for rehearing.

### Formation of JMV (Debtor)

17.     JMV Holdings, LLC ("***JMV***" or "***Debtor***") is a sole member, Texas limited liability company formed by Michael on November 30, 2009.  Michael is listed on the Certificate of Formation of Limited Liability Company as the registered agent for JMV, and JMV Managers LLC is listed as the manager.

18.     JMV Managers, LLC ("***JMV Managers***") is a Texas limited liability company which has served as manager of the Debtor from its organization until December 31, 2020. Michael formed, and is the manager of, JMV Managers per the Certificate of Formation of Limited Liability Company filed in the Office of the Secretary of State of Texas on November 30, 2009.

19.     The sole member of JMV Managers is the MAR Living Trust ("***MAR***"), a revocable trust in which Michael is the settlor.  Michael is also the trustee for MAR and Jennifer and their minor children are the sole beneficiaries.

20.     On December 29, 2009, JMV bought the real property and improvements located at 7047 Joyce Way, Dallas, Texas (the "***Joyce Way Property***") for $247,500.00.[2]

21.     Michael's testimony that he discussed the purchase of the Joyce Way Property with Suzann a dozen times, and that she thought the purchase was a good idea, was not credible.  Nor was Michael's testimony that Suzann authorized him to use funds belonging to her or the Trust to acquire the Joyce Way Property.  Suzann testified, credibly, that she had no knowledge of the purchase of the Joyce Way Property.

---

[2] Jennifer testified that she wanted her parents to move from Houston to Dallas to help her care for her two children when Michael was out of town.  She and Michael testified that they planned for Jennifer's parents to live in the Joyce Way Property.  She and Michael further testified that they wanted to hide the home from one of Michael's estranged siblings and so purchased it through JMV.

22.     Both the Debtor (JMV) and JMV Managers are on the Arbitration Award and Judgment Exhibit "A" list of entities Michael formed or invested, in whole or in part with monies or property misappropriated from and originating with Suzann.  Michael formed JMV and JMV purchased the Joyce Way Property, less than three months after Michael fraudulently induced Suzann to sign the FSA and prior to her initiation of the Fiduciary Lawsuit.

23.     On August 2, 2019, the Texas Secretary of State forfeited the charter of JMV and JMV Managers.

**Source of Money Used to Purchase Joyce Way Property**

24.     Michael bought the Joyce Way Property in the name of JMV for $247,500.  Michael paid the purchase price with a $5,000 earnest money check from his personal checking account at Texas Capital Bank and a wire from his personal checking account to pay the balance due at closing.  Michael thereafter exercised control over the Joyce Way property and executed all relevant documents related to JMV and the Joyce Way Property.

25.     Jennifer claims she provided JMV with the funds for the purchase of the Joyce Way Property from her separate property.  That claim is not credible.  The evidence before the Court shows that Michael was the source of all or substantially all the funds used to purchase and maintain the Joyce Way Property.

26.     At some point after the entry of the Arbitration Award and Judgment and prior to the trial of this adversary proceeding, Jennifer and Michael began claiming that they had entered into a Premarital Agreement dated February 6, 2003.[3]  Suzann testified, credibly, that she had no knowledge of a pre-marital agreement between Jennifer and Michael.

---

[3] Jennifer and Michael were unable to produce the original document.

27. The alleged premarital agreement provides that Michael and Jennifer's earnings would remain their separate property.

28. According to Jennifer's testimony, Michael gifted her funds from his business earnings, which then became her separate property, and she provided those funds to JMV to purchase the Joyce Way Property pursuant to the alleged pre-marital agreement. The funds for the purchase of the Joyce Way Property, however, were never transferred to Jennifer but came directly from Michael's personal account. Further, the evidence does not reflect that Michael had any business earnings not sourced to Suzann, the Trust, or the Trust assets.

29. Paragraph 21 of the alleged pre-marital agreement requires that "gifts of separate property to either spouse from the other spouse (other than personal clothing, jewelry, sporting goods, and items of adornment) must be evidenced in writing, signed and acknowledged before a notary public by both parties." No such writing was introduced at trial and Jennifer did not claim that one existed as to the funds used to purchase the Joyce Way Property or any other funds Jennifer and Michael claim that Michael gifted Jennifer to maintain and improve the Joyce Way Property.

30. Paragraph 21 of the alleged pre-marital agreement goes on to state: "Any other attempt at making a gift of separate property between the parties shall be void."

31. At trial, Michael testified that the funds he used to purchase the Joyce Way Property came from a $3 million "bonus" he received from ARS Investment Holdings on September 30, 2009. Jennifer's exhibits included a statement from Michael's personal checking account at Texas Capital Bank. The statement shows a wire in from ARS Investment Holdings in the amount of $3 million on September 30, 2009.

32. On that date, September 30, 2009, Efficient Attic Systems, LP, its general partner, Efficient Attic Systems GP, and Icarus Investments, Inc. entered into an Asset Purchase

Agreement whereby Efficient Attic Systems, LP and Icarus Investments, Inc. sold their assets to EAS Residential Services, LLC, for an estimated purchase price of $15 million. ARS Investment Holdings, LLC was a guarantor under the Asset Purchase Agreement. Michael signed the Asset Purchase Agreement as the president of the seller, the president of its general partner, and the president of Icarus Investments.

33.     Michael testified that he received a $3 million as a bonus for his marketing work and personal services and, as such, the funds were his separate property under the alleged pre-marital agreement. ARS Investment Holdings wired $3 million to Michael on the date the parties executed the Asset Purchase Agreement. However, the Asset Purchase Agreement does not provide for any bonus to be paid to Michael. Michael did not produce any other contract that would entitle him to a bonus.

34.     At the time he signed the Asset Purchase Agreement, Michael had not yet been removed from his role as trustee of Suzann's Trust. The sellers under the Asset Purchase Agreement were three entities listed on Exhibit "A" to the Judgment and Arbitration Award -- EAS Residential Services, LLC, Efficient Attic Systems, LP, Efficient Attic Systems GP, Inc. and Icarus Investments, Inc. At trial, Michael was uncertain exactly where or to whom the $15 million estimated purchase price was sent.

35.     The Court finds that the $3 million wired to Michael's account did not constitute a bonus paid by the purchaser or sellers under the Asset Purchase Agreement. Rather, the $3 million constituted a portion of the payment due from the purchasers. While $3 million of the proceeds of the Asset Purchase Agreement made its way to Michael, Suzann and the Trust did not receive any of the sale proceeds.

36.    Michael's transactions relating to the EAS Residential Services, LLC, Efficient Attic Systems, LP, Efficient Attic Systems GP, Inc. and Icarus Investments, Inc.  were among the transactions at issue during the arbitration and State Court Proceeding.

37.    Michael's testimony that he discussed the Asset Purchase Agreement with Suzann was not credible.  Suzann testified, credibly, that she had no knowledge of the sale.

38.    The relationship between Suzann and Michael was in turmoil at the time Michael entered into the Asset Purchase Agreement.  Two days after the execution of the Asset Purchase Agreement, on October 2, 2009, Suzann and Michael signed the FSA.[4]  Less than two months later, on November 20, 2009, Michael resigned as trustee of the Trust.

39.    On the date JMV filed a bankruptcy petition, November 9, 2018, JMV executed a Promissory Note ("*Note*") in the original principal amount of $200,000 payable to Jennifer allegedly to secure a prior loan to JMV to purchase the Joyce Way Property.  Michael signed the Note for JMV in his capacity as the manager of JMV Managers, LLC, the entity that managed the affairs of the Debtor.

40.    The Note was purportedly secured by the Joyce Way Property pursuant to a Deed of Trust.  Michael signed the Deed of Trust for JMV in his capacity as the manager of JMV Managers, LLC.  The Deed of Trust was signed and filed in the real property records of Dallas County, Texas, mere hours before JMV filed a bankruptcy petition in this Court.

**The JMV Bankruptcy**

41.    On November 9, 2018, JMV filed a voluntary petition under chapter 11 of the Bankruptcy Code.  Michael testified that the purpose of the bankruptcy was to prevent Suzann

---

[4] Notably, in the FSA Michael promised to the distribute the now non-existent assets of Icarus Investments, Inc. to Suzann's Trust.

from reaching the JMV's assets in her efforts to collect on the Judgment. The sole asset of JMV was the Joyce Way Property.

42.   Michael signed the bankruptcy petition and the bankruptcy schedules in his capacity as manager of JMV Managers LLC, the entity that managed the affairs of the Debtor. Jennifer testified that she paid a $15,000 retainer for a bankruptcy attorney from her separate property.

43.   On May 15, 2019, JMV's chapter 11 case was converted to a case under Chapter 7 of the Bankruptcy Code.   Christopher J. Moser is the duly appointed chapter 7 trustee of JMV's bankruptcy estate.

44.   On March 5, 2019, Suzann filed Proof of Claim No. 3-1 as an unsecured claim in the amount of $65,000,000. On December 10, 2020, Suzann filed an amended Proof of Claim No. 3-2 in the amount of $65,000,000.[5]  Proof of Claim No. 3-2 asserts an equitable lien on all the assets of JMV. Suzann attached a copy of a petition she filed in state court against JMV, Jennifer, Michael and Tavistock Group LLC, seeking to collect the Judgment.

45.   Jennifer objected to the allowance of Suzann's claim.  In her objection, she argued that she is the sole member and owner of JMV and that the Judgment only imposed a constructive trust on business interests owned by Michael.

46.   On August 13, 2019, Jennifer filed Proof of Claim 6-1 as a secured claim in the amount of $743,811.82.  Jennifer asserts a secured claim based upon the Deed of Trust filed against

---

[5] The deadline for filing claims in this case was August 13, 2019.  With respect to the timeliness of Suzann's amendments, the Federal Rules of Bankruptcy Procedure set deadlines for filing proofs of claim but not for amending them.  *See* FED. R. BANKR. P. 3002(c). Amendments to proofs of claim generally relate back to the original filing they amend, whether the amendments are filed timely or tardily.  *In re Friesenhahn,* 169 B.R. 615, 618 (Bankr. W.D. Tex. 1994).

the Joyce Way Property on the bankruptcy petition date.   In Proof of Claim No. 6-1, Jennifer

asserts that the Debtor owes her the following amounts:

a.   House Purchase Price $247,500.00
b.   Accrued Interest (10% APR) $225,362.49
c.   Bankruptcy Attorney Retainer $ 15,000.00
d.   Home Improvements $100,000.00
e.   Property Taxes (2009-2019) $ 83,949.33
f.   Insurance (2009-2019) $ 24,000.00
g.   Utilities and Maintenance (2009-2019) $ 48,000.00
      **Total Claim: $743,811.82**

47.    Jennifer asserts that she is entitled to recover expenses in addition to the purchase

price under a future advance clause in the Deed of Trust.  The Deed of Trust provides: "This deed

of trust also secures payment of any debt Grantor may subsequently owe to Lender that arises

while Guarantor owns the Property."

48.    Although Jennifer has not worked outside the home since 2004, she testified that

she paid for some of the expenses relating to the Joyce Way Property from her separate property.

Jennifer testified that most of the funds used for the Joyce Way Property were gifts to her from

Michael consistent with their alleged pre-marital agreement.

49.    Jennifer did not present documentary evidence in support of her claim that she was

the source of the funds for the alleged home improvements, property taxes, insurance, utilities or

maintenance included in her proof of claim.  For example, her exhibits included tax assessments

sent to JMV but no documentary evidence of who paid the taxes.  Bills from ADT Security

Services and Atmos Energy were sent to Michael.  Further, her claim for accrued interest is for the

years prior to the execution of the Note and Deed of Trust.

50.    Jennifer's exhibits included a one-page bank statement for an account in her name

that showed she issued a check for $15,000 on November 9, 2019.  She testified that she issued

this check to pay for JMV's bankruptcy counsel.

51.     In July 2019, the chapter 7 trustee sought and obtained authority to employ a real estate broker to market the Joyce Way Property for sale.  The broker marketed the Joyce Way Property, including, but not limited to, listing it on MLS and showing the property to potential purchasers.  On October 22, 2019, after receiving a purchase offer, the chapter 7 trustee filed a motion to sell the Joyce Way Property.  No one objected to the trustee's motion.  On November 19, 2019, this Court entered its Order Authorizing Trustee to Sell Real Property Free and Clear of All Liens, Claims and Encumbrances (the "***Sale Order***"). [6]

52.     The chapter 7 trustee is currently holding approximately $420,000.00 of proceeds from the sale of the Joyce Way Property.

53.     On May 14, 2020, Jennifer Ruff and the chapter 7 trustee entered into a tolling agreement wherein they agreed that all applicable statutes of limitations and other time limitations arising under 11 U.S.C. §§544, 545, 547, 548, 549 and 550 would be tolled through March 4, 2021.

54.     On January 11, 2021, Jennifer initiated this adversary proceeding against Suzann and the Chapter 7 trustee.  Her complaint sought (1) a declaratory judgment that neither the constructive trust in favor of Suzann or the equitable lien imposed by the Judgment in the State Court Proceeding is enforceable against the proceeds from the sale of JMV's property; (2) a determination of the extent and validity of Suzann's equitable lien; (3) a judgment that JMV and its assets are Jennifer's separate property; (4) a declaratory judgment that Jennifer is a third party beneficiary of the FSA and that Suzann released any claims against Jennifer in the FSA; and (4) indemnification and recovery of damages and attorneys' fees arising out of the indemnification provisions of the FSA.  Jennifer also seeks an order disallowing Suzann's claim against JMV.

---

[6] In her closing arguments, counsel for Jennifer referenced the sale of the Joyce Way Property as a "fire sale." This description is not accurate and contradicts the express findings of this Court in the Sale Order.

55.     The Chapter 7 trustee counterclaimed against Jennifer, seeking (1) to avoid the Deed of Trust against the Joyce Way Property that was filed several hours before JMV's bankruptcy petition as a preferential transfer; (2) disallowance of Jennifer's proof of claim; (3) recharacterization of Jennifer's claim as equity; and (4) seeking to recharacterize Jennifer's alleged contributions to JMV as equity or, alternatively, equitable subordination of Jennifer's claim.

## CONCLUSIONS OF LAW

### The Sale Order

1.     As an initial matter, Jennifer argues Suzann's claim for a constructive trust on JMV and its assets fails because this Court previously decided that the Joyce Way Property is property of the estate when it entered the Sale Order.

2.     The Bankruptcy Code provides that the bankruptcy estate shall include all legal and equitable interests of the debtor in property as of the commencement of the case.  11 U.S.C. § 541(a)(1).  The Code further provides that "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate ... only to the extent of the debtor's legal title to such property, but not to the extent of an equitable interest in such property that the debtor does not hold."  11 U.S.C. § 541(d).  The Fifth Circuit has held that § 541(d) accords the beneficiary of a constructive trust, properly imposed under state law, the right to recover the trust property from the bankruptcy trustee or the debtor. *See Matter of Haber Oil Co., Inc.*, 12 F.3d 426, 436 (5th Cir. 1994).

3.     Paragraph N of the Sale Order stated that JMV owned the Joyce Way property, and this Court exercised its jurisdiction over JMV to approve the sale.  Since this Court previously exercised jurisdiction over JMV, Jennifer argues that Suzann's claim that the Joyce Way Property is subject to a constructive trust is barred.

4.     On the bankruptcy petition date, JMV held legal title to the Joyce Way Property. The Joyce Way Property was property of JMV's bankruptcy estate to the extent of JMV's legal interest.   The chapter 7 trustee's motion to sell the Joyce Way Property was not contested. Paragraph O of the Sale Order recited that Suzann and Jennifer had filed claims against JMV's estate.   And Paragraph U recited that Jennifer and Suzann had consented to the sale of the Joyce Way Property and reviewed the Sale Order, which was drafted by the chapter 7 trustee.

5.     The Court, therefore, finds and concludes that the issue of whether Suzann holds an equitable interest in the Joyce Way Property as a result of a constructive trust was not previously litigated or decided.   Suzann is not barred from asserting that the Joyce Way Property and any interest of whatever nature Michael has in JMV were subject to a constructive trust on the bankruptcy petition date.

### Release and Indemnification

6.     At trial, Jennifer argued that she is a third-party beneficiary of the FSA and that Suzann thereby released any claims against her or JMV.   She also seeks indemnification and attorneys' fees from Suzann pursuant to the terms of the FSA.

7.     The Arbitration Award and Judgment expressly denied Michael's affirmative defenses of release or waiver because any "alleged settlement agreements" with his mother had been fraudulently induced.   "As a rule, a party is not bound by a contract procured by fraud."   *See Formosa Plastics Corp. v. Presidio Eng'rs & Contractors,* 960 S.W.2d 41, 46 (Tex. 1998).

8.     Jennifer, however, emphasizes that she was not a party to the arbitration or the State Court Proceeding.   Jennifer points out that the Arbitration Award and Judgment did not set aside or nullify the FSA.   Thus, as an alleged third-party beneficiary of the FSA, she argues that she may assert claims arising from its release and indemnification provisions in this proceeding.

9.      Suzann responds that even assuming Jennifer is a third-party beneficiary of the FSA, Jennifer is in privity with her husband and is bound by the Judgment enforcing the Arbitration Award.

10.      Because the Judgment was entered by a Texas state court, this Court applies Texas law to determine its preclusive effect.  *Cox v. Nueces Cnty.*, 839 F.3d 418, 421 (5th Cir. 2016).

11.      "Res judicata, or claims preclusion, prevents the re-litigation of a claim or cause of action that has been finally adjudicated, as well as related matters that, with the use of diligence, should have been litigated in the prior suit." *Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 628 (Tex. 1992); *see Smith v. Brown*, 51 S.W.3d 376, 379 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).

12.      To establish res judicata under Texas law, three elements must be satisfied: "(1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action." *Cox v. Nueces Cnty.*, 839 F.3d at 421 (quoting *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex. 1996)).

13.      Likewise, an arbitration award has preclusive effect for purposes of res judicata. *See Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld*, 105 S.W.3d 244, 270 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *see also Anzilotti v. Gene D. Liggin, Inc.*, 899 S.W.2d 264, 266 (Tex. App.—Houston [14th Dist.] 1995, no writ); *J.J. Gregory Gourmet Servs., Inc. v. Antone's Import Co.*, 927 S.W.2d 31, 33 (Tex. App.—Houston [1st Dist.] 1995, no writ); *City of Baytown v. C.L. Winter, Inc.*, 886 S.W.2d 515, 518 (Tex. App.—Houston [1st Dist.] 1994, writ denied).

14.      In this case, the first and third elements are clearly satisfied.  The Judgment is final. The Judgment, which incorporated the terms of the Arbitration Award, expressly denied Michael's

affirmative defense and claim that Suzann's claims against him had been released by the FSA because the FSA was fraudulently induced.

15.    With respect to the second element, "[t]here is no general definition of privity that can be automatically applied in all res judicata cases; the circumstances of each case must be examined." *Getty Oil Co. v. Insurance Co. of N. Am.*, 845 S.W.2d 794, 800 (Tex. 1992).  "An analysis to determine whether a person is in privity with a party to a prior judgment begins by examining the interests the parties shared." *Truck Ins. Exch. v. Mid-Continent Cas. Co.*, 320 S.W.3d 613, 618 (Tex. App.—Austin 2010, no pet.).  Privity exists if "the parties share an identity of interests in the basic legal right that is the subject of litigation."

16.    Parties can be in privity in three ways: (1) they can control an action even if they are not parties to it; (2) their interest can be represented by a party to the action; or (3) they can be successors in interest, deriving their claims through a party to the prior action.  *Mayes v. Stewart*, 11 S.W.3d 440, 449 (Tex. App.—Houston [14th Dist.] 2000, pet. denied), *disapproved of on other grounds by Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136 (Tex. 2019).

17.    Here, Jennifer's interest in the arbitration and the State Court Proceeding was represented by her husband.  The Court concludes that Jennifer and Michael share an identity of interests with respect to the Judgment such that res judicata applies as to the enforceability of the FSA and Jennifer's arguments for release and indemnification under the FSA.  The Court further concludes that Jennifer's claims for release and indemnification should be denied.

### Source of Funds for the Joyce Way Property

18.    As relevant to this proceeding, the Judgment imposed a constructive trust "on Michael Ruff's interests, of whatever nature, in any entity in which he formed or invested, in whole

or in part with monies misappropriated from … Suzann ..., which the panel finds includes, but is not limited to" JMV.

19.      The language of the Judgment is clear and does not require any interpretation by this Court.  Suzann seeks to enforce the Judgment by its terms.

20.      Jennifer argues that the plain language of the Arbitration Award excludes JMV because, according to Jennifer, she is the sole member and owner of JMV.  She argues that Michael does not have any ownership interest in JMV and, therefore, the Judgment cannot reach it. However, the Judgment clearly imposes a constructive trust on any interest "of whatever nature" that Michael has in any entity he formed or invested using misappropriated funds, including JMV.

21.      At the time of the entry of the Arbitration Award, Michael had already acquired the Joyce Way Property.  The funds Michael provided for the purchase of the Joyce Way Property came from his personal checking account.  Michael claims to have received those funds as a "bonus" for his personal services and marketing.  He also claims that his earnings were his separate property under the terms of the alleged premarital agreement.

22.      Michael and Jennifer testified that Michael gifted Jennifer a portion of his $3 million bonus for the purchase of the Joyce Way Property.  However, any alleged gift of funds to Jennifer was not evidenced by a signed and notarized writing and was therefore void under the terms of the alleged pre-marital agreement.  Thus, no gift occurred, Jennifer had no separate property interest in the funds, and Michael used his separate property to purchase the Joyce Way Property.  In addition, one of the elements of a gift is the delivery of the property, which did not occur here with respect to the funds used to purchase the Joyce Way Property.  *See In re Marriage of Moncey*, 404 S.W.3d 701, 710 (Tex. App. – Texarkana 2013, no pet.) ("Three elements are

required to establish the existence of a gift: (1) intent to make a gift, (2) delivery of the property, and (3) acceptance of the property.").

23.     The funds Michael claims to have received as a "bonus," and which he used to purchase the Joyce Way Property, are traceable to Michael's fraud against his mother.  Michael was still the trustee of Suzann's Trust when he entered into the Asset Purchase Agreement without his mother's knowledge.  The sellers under the Asset Purchase Agreement are listed on Exhibit "A" to the Arbitration Award, that is, the arbitrators traced Michael's fraud to those entities.  Although the sellers supposedly received an estimated $15 million for the sale of their assets, Michael, as president of the sellers and trustee of his mother's Trust, was unable to say what happened to those funds.

24.     After forming JMV and purchasing the Joyce Way Property, Michael continued to exercise complete control over JMV and the Joyce Way Property.  All operative documents were signed by Michael, and he was the source of substantially all funding.  The Court finds that the Joyce Way Property was Michael's separate property under the alleged premarital agreement and was being held in title only by JMV for his benefit.  The Judgment therefore imposed a constructive trust on the Joyce Way Property.

25.     Likewise, the Arbitration Award and Judgment traced Michael's misappropriation of Suzann's assets to JMV.[7]  Jennifer is bound by the Judgment enforcing the Arbitration Award for the reasons previously discussed.

---

[7] In her adversary complaint, Jennifer argues that Suzann had some additional duty to trace her misappropriated funds to JMV.  That tracing, however, necessarily occurred as part of the imposition of a constructive trust in the Judgment.  *See, e.g., Hahn v. Love,* 321 S.W.3d 517, 533 (Tex.App.-Houston [1st Dist.] 2009, pet. denied) (in order to be entitled to a constructive trust, the party must prove (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; (3) and tracing to an identifiable res).

26.     Further, Jennifer's testimony about JMV and the purchase of the Joyce Way Property generally was not credible.  Michael, not Jennifer, signed all the documents forming JMV.  The funds used to purchase the Joyce Way Property did not come from Jennifer but directly from Michael's personal checking account.  JMV's bills were sent to Michael, and Michael signed all the Texas Franchise Tax Public Information Reports (from 2010 – 2017).

27.     Jennifer has not worked outside the home since 2004, and she did not present any evidence of any source of income other than her husband.  Jennifer did not document any loan to JMV for the purchase of the Joyce Way Property in 2009 until JMV's petition date in 2018.

28.     Although Jennifer claimed that the source of the "gifted" funds to purchase the Joyce Way Property was a $3 million "bonus" paid to Michael, Michael did not have any contractual right to a bonus and did not receive one.

29.     Jennifer's claim to be the sole member of JMV, even if true, does not give her any right to its assets or shield JMV from the Judgment.  A limited liability company is considered a separate legal entity from its members.  *See Geis v. Colina Del Rio, LP,* 362 S.W.3d 100, 109 (Tex. App. — San Antonio 2011, pet. denied) (recognizing limited liability company legally distinct from member); *Sanchez v. Mulvaney,* 274 S.W.3d 708, 712 (Tex. App. — San Antonio 2008, no pet.) (same).  A member of a limited liability company does not have an interest in any specific property of the company.  Tex. Bus. Orgs. Code § 101.106(b).

30.     The preponderance of the evidence at trial established that Michael formed JMV unbeknownst to his mother.  The preponderance of the evidence established that Michael used money misappropriated from his mother to purchase the Joyce Way Property in JMV's name.[8]

---

[8] In her adversary complaint, Jennifer claims that any action by Suzann to collect funds Michael transferred to JMV is barred by limitations because Suzann knew as early as 2010 that Michael was creating JMV and purchasing the Joyce Way Property.  The testimony of Michael and Jennifer that discussed JMV and the purchase of the Joyce way Property in 2009 was not credible.  Even if Suzann had known about JMV and the Joyce Way Property, she was

And the preponderance of the evidence established that Michael thereafter exercised all rights of ownership, including managing JMV and paying its bills without direction from Jennifer.  After the Judgment, Michael even allowed the façade of a separate legal entity to lapse by forfeiting the charter for JMV and JMV Managers.

31.    In any event, the arbitration panel traced Suzann's misappropriated property to JMV and JMV Managers.  JMV and JMV Managers are included on the Arbitration Award and Judgment Exhibit "A" list of entities Michael formed or invested, in whole or in part, with monies or property misappropriated from and originating with Suzann.  At trial, as discussed, the preponderance of the evidence established that Michael formed JMV and invested misappropriated monies in JMV to purchase the Joyce Way Property for $247,500.

32.    Jennifer appears to have facilitated her husband's scheme to defraud his mother and then to avoid the consequences of the Judgment.[9]

33.    The Court, therefore, concludes that the Judgment imposes a constructive trust on the Joyce Way Property and any interest Michael has in JMV.  Inasmuch as the alleged gifts of money to Jennifer failed, the funds Michael invested in JMV to purchase and maintain the Joyce Way Property remained his separate property under the alleged premarital agreement.  JMV merely held title.  Michael at all times owned the equity interest in the Joyce Way Property, and that interest is impressed with a constructive trust pursuant to the Judgment.  JMV's only asset, the Joyce Way Property, is not property of the bankruptcy estate and may be recovered by Suzann pursuant to § 541(d) of the Bankruptcy Code.

_____

unaware that her son was misappropriating her funds to purchase the Joyce Way Property, and Michael vigorously contested her claims for fraud in the Fiduciary Lawsuit.  Moreover, Suzann is not asserting that she made a loan to JMV.

[9] As previously discussed, the Joyce Way Property was unoccupied on the petition date and was not being used by Jennifer's parents as a residence.

## Preference (11 U.S.C. § 547)

34.     The Court now turns to the chapter 7 trustee's objections to Jennifer's proof of claim.  One of his objections is that Jennifer received a preferential transfer and, therefore, her claims should be disallowed.  *See* 11 U.S.C. § 502(d).

35.     According to § 547(b) of the Bankruptcy Code, a trustee may "avoid any transfer of an interest of the debtor in property" if he can show "that the payment was (1) to the creditor, (2) on account of a previous debt, (3) made while the debtor was insolvent, (4) made 90 days before the bankruptcy petition was filed, and (5) effective in enabling the creditor to receive more than it would have received had the debtor's estate been liquated under Chapter 7."  *In re Globe Manufacturing, Corp.*, 567 F.3d 1291, 1296 (11ᵗʰ Cir. 2009).

36.     The fixing or perfection of a lien is a "transfer" within the meaning of § 547(b) of the Bankruptcy Code.  *See Matter of Criswell*, 102 F.3d 1411, 1415 (5ᵗʰ Cir. 1997).  Thus, in this case, Jennifer's filing of the Deed of Trust was a "transfer" of an interest of the Debtor in property within the meaning of § 547(b) of the Bankruptcy Code.

37.     The filing of the Deed of Trust was made on Jennifer's behalf on account of an antecedent debt since Jennifer asserts she was a creditor of the Debtor prior to the recording.

38.     Jennifer filed her Deed of Trust mere hours before the Debtor filed its bankruptcy petition and clearly within 90 days of the date of bankruptcy.

39.     A debtor is presumed insolvent during the 90 days immediately preceding the date of bankruptcy.  *See* 11 U.S.C. § 547(f).  The Fifth Circuit has interpreted this presumption to mean that the creditor against whom the preference action is brough must come "forward with evidence to rebut or meet the presumption."  *In re Emerald Oil Col*, 695 F2d 833, 837 (5ᵗʰ Cir 1983).

40.     Here, Jennifer has not introduced evidence tending to show that the Debtor was solvent when the Deed of Trust was filed.  The Debtor's only asset was the Joyce Way Property. After extensive marketing by the chapter 7 trustee, the chapter 7 trustee sold the Joyce Way Property for approximately $420,000.  The filed claims far exceed that amount.[10]  Accordingly, the Court finds that the Debtor was insolvent when the Deed of Trust was filed.

41.     Finally, to determine whether a trustee has established the fifth requirement, a court typically uses the so-called "hypothetical Chapter 7 liquidation analysis."  *In re Tusa-Expo Holdings, Inc.*, 811 F.3d 786, 792 (5th Cir. 2016).  The court (1) constructs a hypothetical Chapter 7 liquidation in which the creditor retains the disputed transfers, and (2) constructs another in which the creditor returns those transfers for distribution to all creditors by the bankruptcy trustee. *Id.*  To satisfy the requirement of § 547(b)(5) under this analysis, the sum of (1) the disputed transfers and (2) the creditor's distribution in the transfers-retained hypothetical must be "more" than the creditor's distribution in the transfers-returned hypothetical.  *Id.*

42.     Here, the Court has previously determined the JMV was subject to a constructive trust in favor of Suzann on the petition date.  The Joyce Way Property was the Debtor's only asset and, as the chapter 7 trustee noted at trial, the Court's conclusion means there is essentially no bankruptcy estate.

43.     However, if the equitable interest in the Joyce Way Property was property of the estate, the Note and Deed of Trust enabled Jennifer to receive more than she would receive as an unsecured creditor in a chapter 7 case.  In a chapter 7 case, Jennifer would not be entitled to all the proceeds of the sale.  Jennifer would receive a pro rata distribution shared with other unsecured creditors, specifically, the United States Trustee and Suzann.  The Note creates a fictitious debt,

---

[10] Further, if Jennifer's verified proof of claim is to be believed, the Debtor has not paid any of the debt it has incurred to her since she loaned it funds to purchase the Joyce Way Property.

and the Deed of Trust would allow Jennifer to receive more than she would as an unsecured creditor.

## The Trustee's Objections to Jennifer's Claim

44.     The chapter 7 trustee's objection to Jennifer's claim is sustained and her claim is disallowed as follows:

a. Jennifer has received an avoidable transfer under § 547(b);
b. Jennifer did not loan $200,000 to JMV to purchase the Joyce Way Property;
c. Jennifer did not make any advances to JMV to pay for home improvements, property taxes, insurance, utilities or maintenance; and
d. Jennifer is not entitled to interest that allegedly accrued prior to the signing of the Note.

45.     Jennifer and Michael executed the Note and Deed on the bankruptcy petition date to thwart Suzann's rights with respect to JMV and the Joyce Way Property.

46.     The chapter 7 trustee does not oppose the allowance of an unsecured claim for Jennifer for the $15,000 she testified that she paid to JMV's bankruptcy counsel.

47.     Alternatively, the chapter 7 trustee argues that, to the extent Jennifer provided funds to the Debtor, her claim relating to those funds should be recharacterized as equity.

48.     State law controls whether an alleged debt should be recharacterized as equity. *Grossman v. Lothian Oil Inc. (In re Lothian Oil Inc.),* 650 F.3d 539. 544 (5th Cir. 2011).  Texas law on recharacterization applies the multi-factor test used in federal tax cases set out in *Fin Hay Realty Co. v. U.S.*, 398 F.2d 694, 696 (3rd Cir. 1968). *Arch Petroleum, Inc. v. Sharp*, 958 S.W.2d 475, 477 n.3 (Tex. App.—Austin 1977, no writ).  Those factors are:

(1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the 'thinness' of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provision of a fixed rate of interest; (11) a contingency

on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation.

*Fin Hay*, 398 F.2d at 696. *See also O'Chesky v. Koehler (In re American Housing Foundation)*, 499 B.R. 517 (Bankr. N.D. Tex. 2013).

49.     Here, the Judgment and Arbitration Award traced Suzann's misappropriated funds to JMV. There is no credible evidence that Jennifer used her separate property to purchase, maintain, or improve the Joyce Way Property.

50.     Jennifer, who claims to be the sole member and owner of JMV, also claims to be a secured creditor. The loan she claims to have made to JMV was not documented until the bankruptcy petition date. Further, Michael, not Jennifer, was the source of the funds. The Debtor never made any loan repayments to Jennifer and had no source of funds to do so. (There is no evidence JMV charged Jennifer's parents rent while they lived in the Joyce Way Property and the house was unoccupied on the bankruptcy petition date.) Jennifer took no action to collect a debt from JMV prior to bankruptcy.

51.     In summary, the Court concludes that the Note and Deed of Trust were a fictitious attempt to create a claim and a lien. Jennifer did not make the loans and "advances" detailed in her proof of claim or, alternatively, any advance allegedly made by Jennifer to JMV with her separate property should be recharacterized as equity.[11]

## CONCLUSION

For the foregoing reasons, Jennifer's objection to Suzann's proof of claim is **OVERRULED**. Jennifer's requests for a declaratory judgment are **DENIED**. The chapter 7

---

[11] In light of the Court's conclusion, the Court need not address the chapter 7 trustee's request for subordination of Jennifer's claim.

trustee established that the Deed of Trust should be set aside as a preference.  In addition, the

chapter 7 trustee's objection to Jennifer's claim is **SUSTAINED** and Jennifer's claim is

disallowed, as set forth herein.  The Court will enter a separate Judgment consistent with these

Findings of Fact and Conclusions of Law.


Signed on 03/31/2022

_Brenda T. Rhoades_       SD

HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE